IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH HUTTER, | ) | Case No. 1:20-cv-1472 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER**[1] |
| Defendant. | ) | |

Plaintiff, Deborah Hutter, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. She contends that the Administrative Law Judge ("ALJ") misevaluated her residual functional capacity ("RFC") when he failed to consider a questionnaire by her treating physician and did not explicitly summarize portions of her testimony and treatment notes. However, because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hutter's application for DIB must be affirmed.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 10.

I.      **Procedural History**

Hutter reapplied[2] for DIB on December 10, 2015. (Tr. 665-71).[3] She said that she became disabled on June 27, 2010, due to: "1. Fibromyalgia; 2. Diverticul[i]tis; 3. Colitis; 4. Degenerative Disc Disease; 5. COPD; 6. Bone Spurs; 7. Right Hip; 8. Lumbar Disc Damage; 9. Herniation and Lumbosacral Radiculopathy; 10. Cervical Radicular Syndrome; 11. Thoracic Radicular Syndrome; 12. Post Laminectomy Syndrome; 13. Osteoarth[r]itis Neck and Lumbar; 14. High Heart Rate; [and] 15. Low Blood Pressure. (Tr. 665, 715). The Social Security Administration denied Hutter's application initially and upon reconsideration. (Tr. 474-87, 520-31). ALJ Keith J. Kearney heard Hutter's case on April 4, 2019 and denied the claim in a June 20, 2019 decision. (Tr. 427-35, 443-73). In doing so, the ALJ determined that Hutter had the RFC to perform light work, except that:

> [Hutter] can stand and work 4 hours in an 8-hour workday. [She] [c]an never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. [She] [c]an occasionally stoop, kneel, and crouch, but can never crawl. She can occasionally reach overhead bilaterally. She must avoid all exposure to hazards such as unprotected heights and industrial machinery.

(Tr. 431-32). Based on vocational expert testimony that an individual with her age, experience, and RFC could perform Hutter's past relevant work as a medical clerk, the ALJ determined that she wasn't disabled. (Tr. 435). On April 29, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). And, on July 6, 2020, Hutter filed a complaint to obtain judicial review. ECF Doc. 1.

---

[2] Hutter previously applied for benefits in 2011, claiming a disability onset date of June 27, 2010. That application was denied after ALJ review on January 25, 2013. Hutter appropriately concedes that the period of adjudication in this action is between January 26, 2013 and her date last insured, December 31, 2014. *See* ECF Doc. 12 at 2.

[3] The administrative transcript appears in ECF Doc. 9.

2

II.  Evidence

    A.  **Personal, Educational, and Vocational Evidence**

Hutter was born on March 17, 1965 and was 45 years old on the alleged onset date. (Tr. 520, 665). She completed high school in 1983, and she had prior work as an office assistant medical clerk. (Tr. 469, 716).

    B.  **Relevant Medical Evidence**

Hutter had a history of chronic low back pain, anxiety, fibromyalgia, diverticulosis of the colon, and coronary artery disease. (Tr. 865). Her surgical history included: (1) hysterectomy with oophorectomy for fibroids; (2) throat reconstruction and tonsillectomy for sleep apnea treatment; (3) thoracotomy in 2007; (4) discectomy in 2005; (5) cervical fusion at C5-C6 in 2001; (6) spinal cord stimulator implant in 2006 and removal in 2010 due to development of syncopal episodes; and (7) cardiac catherization in 2009. *See* (Tr. 865, 908, 929, 946, 965, 982, 1031, 1043, 1063, 1066, 1069-70, 1073, 1079, 1567).

On January 8, 2013, Hutter presented to Monica Urban, MD, with neck pain. (Tr. 828). Hutter reported she had chronic neck pain, a C4-C5 fusion and plate removed, fibromyalgia, and thoracic outlet. *Id.* Her skin had been hurting on top of her left neck and shoulder for four days, and she had shooting pains around the back of her neck and top shoulder. *Id.* Hutter rated her pain as 10/10, she appeared tearful, and she had "very decreased" neck range of motion. (Tr. 829). At the time, she reported taking Vicodin for pain, amitriptyline, and clonazepam. (Tr. 829-31). Upon examination, Dr. Urban observed decreased neck range of motion to the left and less to the right side, no skin rashes, and no arm weakness or sensory loss. (Tr. 829). Dr. Urban diagnosed Hutter with cervicalgia, ordered X-rays, referred Hutter to neurosurgery, and prescribed hydrocodone-acetaminophen, prednisone, and lidocaine. *Id.*

X-rays taken on January 8, 2013, showed postoperative and degenerative changes of the cervical spine. (Tr. 798). Alignment was within normal limits, there was no facture or subluxation, and postoperative changes for anterior corpectomy and fusion at C5-C6 were noted. (Tr. 799). There was mild disc space narrowing, facet arthropathy, and mild osteophyte formation. *Id.*

On February 22, 2013, Hutter visited Josephine Fernando, MD, for an initial visit, reporting chronic neck pain that had been increasing in the previous two months. (Tr. 823). She also reported a history of chronic numbness in her fingers and hyperesthesia over the neck area. *Id.* Hutter reported constant burning and stabbing pain in her neck that radiated to her shoulder and was exacerbated by activity. *Id.* Her numbness was intermittent and not exacerbated by anything. *Id.* After review of Hutter's cervical spine X-rays, Dr. Fernando determined that Hutter had cervical degenerative disc disease and history of cervical spinal fusion. (Tr. 824). Dr. Fernando continued medication and ordered an MRI scan. *Id.*

Hutter underwent an MRI scan of her cervical spine on February 28, 2013. (Tr. 795). The results showed postoperative changes at C5-C6 and mild degenerative joint disease. (Tr. 795-96). There was no evidence of herniated disc or nerve root encroachment, though there was mild ligamentous hypertrophy at C4-C5 and C6-C7. (Tr. 796). The results also showed minimal narrowing of the spinal canal and neuroforamina. *Id.* The interpreting physician diagnosed Hutter with cervical disc degeneration. (Tr. 795).

On March 26, 2013, Hutter visited Mary Grace Purisima, MD, reporting that a week before she felt something pop as she was trying to pick something up from the floor. (Tr. 818). She had pain on her lower back with swelling and her right leg gave out one time. *Id.* Upon examination, Dr. Purisima noted back pain with motion and tenderness over the lumbar area. *Id.*

4

Dr. Purisima diagnosed Hutter with lumbar radiculopathy, ordered an X-ray of her spine, and prescribed medication.  *Id.*  Dr. Purisima noted that, although Hutter had some sensation of weakness, she was able to walk without difficulty.  *Id.*

On June 18, 2013, Hutter underwent X-ray scans of her cervical spine, which showed postoperative and degenerative changes of the cervical spine, with no significant interval change. (Tr. 791).  They also showed no evidence of abnormal vertebral body motion on flexion and in extension.  *Id.*  Hutter's spine alignment was within normal limits, without fracture or subluxation.  (Tr. 792).  The disc spaces were mildly narrowed in the inferior cervical levels, with cortical demineralization and facet arthropathy.  *Id.*  The examining physician diagnosed Hutter with cervicalgia.  (Tr. 791).

On September 26, 2013, Hutter visited Jameelah Strickland, MD, reporting that she had fallen a few days prior, injuring her back.  (Tr. 808-09).  Upon examination, she had tenderness on the right paraspinal lumbar area, "fair" range of motion with flexion and extension, "good" range of motion with rotation, and was able to walk on heels and toes.  (Tr. 809).  She was diagnosed with cervicalgia and low back pain, prescribed medication, and advised to quit smoking.  *Id.*

On October 29, 2013, Hutter underwent an EMG of her upper extremities, which revealed chronic mild left C5 radiculopathy, with no evidence of active or ongoing denervation. (Tr. 805).

On January 31, 2014, Hutter visited Mihaela Donca, MD, at Lake Health as a new patient.  (Tr. 1567).  Hutter reported chronic low back pain, fibromyalgia, previously removed spinal cord stimulator, and heart catherization showing partial blockage.  (Tr. 1567).  She suffered from occasional, non-exertional, off-and-on chest pain.  *Id.*  Her medications at the time

included Klonopin, Vicodin, Robaxin, and amitriptyline. *Id.* Upon examination, Hutter had reduced range of motion of the spine, but otherwise had normal range of motion, intact sensation and strength, and normal gait. (Tr. 1567-68). Dr. Donca diagnosed Hutter with chest pain, back pain, insomnia, and coronary atherosclerosis, ordering lab and imaging tests. (Tr. 1568-70). Dr. Donca also refilled her medication. (Tr. 1570).

On February 7, 2014, Hutter was admitted to Lake West hospital after sudden onset of shortness of breath after a large meal with alcohol. (Tr. 908). She also reported occasional numbness in her hands and feet and chronic low back pain. (Tr. 909). Hutter's physical examination results were normal. *Id.* An EKG showed normal sinus rhythm and T-inversion in anterior leads, a chest X-ray was "clear," and a CT scan of her chest was "unremarkable. (Tr. 909-10, 921-24). The attending physician, Dr. Donca, prescribed a peptic ulcer disease prophylaxis for Hutter's insomnia, continued her medication for back pain, scheduled a stress test to evaluate her heart, and increased her proton pump inhibitor for her shortness of breath, which Dr. Donca stated was due to possible hiatal hernia. (Tr. 910).

On April 4, 2014, Hutter returned to Lake Health's emergency department, reporting 6/10 pain radiating from her flank to her abdomen that began in the morning and associated symptoms of oliguria, dark urine, nausea, and urgency. (Tr. 882). She was discharged in stable condition with medication. (Tr. 885).

On April 8, 2014, Hutter returned to Lake Health for a follow up on her emergency room visit and was seen by Kimberly Reho, CNP. (Tr. 1564). Hutter reported "doing well and without complaint." (Tr. 1565). Upon examination, Hutter had normal results, including normal range of motion in al joints, intact and normal sensation and strength, and normal gait. *Id.* Nurse

6

Practitioner Reho diagnosed Hutter with atherosclerosis of aorta (revealed in a recent CT scan), hyperlipidemia, and tobacco use disorder. (Tr. 1564).

On May 7, 2014, Hutter was admitted to the hospital because of lower abdominal pain and rectal bleeding. (Tr. 865). Hutter reported that her stress test was "normal." *Id.* Upon examination, Hutter's results were normal except for diffuse tenderness on her abdomen. (Tr. 866). Dr. Donca ordered a consult for a possible colonoscopy and continued medication except anti-inflammatories. (Tr. 867). Hutter was discharged in stable condition on May 9, 2014, with diagnoses of acute ischemic colitis (revealed by a colonoscopy), gastroesophageal reflux disease, and chronic low back pain. (Tr. 859-60). She had a normal physical examination on discharge. (Tr. 860).

On June 5, 2014, Hutter returned to Dr. Donca for low back pain and low sex drive. (Tr. 1561). Upon examination, Hutter had reduced range of motion of the lumbar spine and tenderness with range of motion, but otherwise had normal range of motion, strength, and sensation. (Tr. 1561-62). Dr. Donca diagnosed Hutter with gastritis and duodenitis, coronary artery disease, low back pain, and claustrophobia. (Tr. 1562). Dr. Donca prescribed aspirin for Hutter's coronary artery disease, increased amitriptyline, ordered an MRI for her low back pain, prescribed lorazepam for her claustrophobia, and refilled her Klonopin prescription. *Id.*

On June 19, 2014, Hutter received an MRI scan of her lumbar spine. (Tr. 1118). It revealed: (1) mild narrowing of the spinal canal at L3-L4 in relation to disc, facet, and ligamentum flavum hypertrophy; (2) diffuse circumferential disc bulge L4-L5 with thecal sac decompressed; and (3) multilevel facet arthropathic change in L4-L5 and L5-LS1. (Tr. 1119).

On August 4, 2014, Hutter had an MRI scan of her cervical spine, which showed: (1) interbody osseous fusion at C5-C6; (2) mild bilateral foraminal narrowing at C6-C7; and

7

(3) minimal disc bulge at C6-C7 effacing the ventral CSF space without narrowing the spinal canal. (Tr. 1245-46).

On August 13, 2014, Hutter was admitted to the hospital after having three days of chest pain lasting two minutes, with pain going to the left neck and arm. (Tr. 1031, 1042). X-rays taken that same day were unremarkable and her EKG showed no evidence of acute ST-T wave changes. (Tr. 1038, 1040, 1054). She underwent a heart catherization and was discharged on August 15, 2014 with diagnoses of acute atypical chest pain, coronary artery disease, benign hypertension, and chronic back pain. (Tr. 1033). Her heart catherization showed no acute findings and she was in stable condition at discharge. *Id.*

On October 30, 2014, Hutter visited Timothy Ko, MD, as a new patient. (Tr. 982). She reported chronic pain (rated at 7/10) that radiated from her neck into her lower back and legs, as well as her hands, and was aggravated by sitting and overhead activity. *Id.* Upon examination, she had pain with extension and flexion, negative straight leg raise test, no evidence of instability, 4/5 strength, decreased sensation in her feet, and diminished knee reflex. (Tr. 983). Dr. Ko diagnosed Hutter with post-laminectomy syndrome (lumbar) and radicular syndrome. *Id.* Dr. Ko gave Hutter a referral for physical therapy, ordered an epidural steroid injection, and refilled her medication. *Id.* The epidural injection was administered on November 10, 2014. (Tr. 1109, 1377).

Hutter returned to Dr. Ko on November 26, 2014, reporting that the epidural injections provided 95% relief to her left-side pain and 40% relief to her right-side pain. (Tr. 1088). Hutter reported that her pain was primarily on the right said (8/10 on average) and was using Norco every six hours. *Id.* Dr. Ko refilled her medications, offered a nerve root transforaminal

8

injection at L3-L4 and referred Hutter for physical therapy. (Tr. 1091-92). The transforaminal injection was administered on December 5, 2014. (Tr. 1107).

On January 6, 2015, Hutter reported to Dr. Ko that the transforaminal injection had provided 50-60% relief. (Tr. 1085). She continued to have lower back, neck, and buttock pain (7/10) with radiation into the right buttock and down the right leg to the knee. *Id.* She had reduced her Norco intake to one to two pills per day. *Id.* Dr. Ko offered a repeat epidural injection and refilled her medication. (Tr. 1086). The injection was administered on January 19, 2015. (Tr. 1105).

On March 4, 2015, Hutter visited Dr. Ko, reporting that her last epidural injection provided 60-70% relief until the week before her visit. (Tr. 1082). Her pain was rated at 8/10. *Id.* She had been taking care of her sick mother and doing heavy lifting. (Tr. 1083). Dr. Ko prescribed Medrol and increased her pain medication. *Id.*

    **C.**    **Relevant Opinion Evidence**

        **1.**    **Treating Source Mihaela Donca, MD**

After the period under adjudication, on February 18, 2016, Dr. Donca completed a questionnaire in connection with Hutter's disability application, stating as follows. (Tr. 1530). Dr. Donca had treated Hutter from January 31, 2014 through February 11, 2016. (Tr. 1531). Hutter's diagnoses were lumbar spondylosis, lumbar radiculopathy, depression, and anxiety, for which she was taking anti-inflammatories, antidepressants, and muscle relaxants. (Tr. 1531-32). Hutter's symptoms included low back pain radiating to her legs with prolonged sitting and walking, anxiety, and depression. (Tr. 1531). Hutter had a reduced range of motion of the lumbosacral spine and flat affect. *Id.* Hutter required physical therapy, medication, and pain management to treat her conditions. *Id.* She had received physical therapy with partial

9

improvement. (Tr. 1532). Dr. Donca also stated that Hutter had difficulty sitting or standing for long periods of time due to back pain, was unable to bend or stoop due to pain, and had periods of difficulty concentrating due to depression. *Id.*

Dr. Donca's questionnaire responses did not indicate whether her conclusions regarding Hutter existed within the period under adjudication. Attached to Dr. Donca's questionnaire were here treatment notes dated January 31 through March 21, 2016. (Tr. 1535-67). Notably, Dr. Donca first diagnosed Hutter with depression on February 11, 2016. (Tr. 1538). The first mention of memory loss was on March 21, 2016. (Tr. 1535). Before then, Hutter repeatedly denied anxiety, depression, memory loss, or dizziness, and there's no mention of concentration problems. *See* (Tr. 1543-67).

### 2. State Agency Consultants

On March 10, 2016, Gerald Klyop, MD, evaluated Hutter's physical capacity based on a review of the medical record. (Tr. 528-29). Dr. Klyop opined that Hutter was limited to: (1) lifting 20 pounds occasionally and 10 pounds frequently; (2) standing/walking up to 4 hours in an 8-hour workday; (3) sitting for 6 hours in an 8-hour workday; (4) frequently climbing ramps/stairs; (5) occasionally stooping, crouching, kneeling, and crawling; and (6) never climbing ladders/ropes/scaffolds. (Tr. 528-29).

On June 9, 2016, Bradley Lewis, MD, concurred with Dr. Klyop's assessment of Hutter's exertional limitations. (Tr. 482). But he additionally found that Hutter could never crawl, could occasionally climb ramps/stairs, was limited to occasional overhead reach, and could not be exposed to workplace hazards. (Tr. 483-84).

D. **Relevant Testimonial Evidence**

Hutter testified at the April 4, 2019, ALJ hearing. (Tr. 454). Between January 2013 and December 2014, her symptoms included tingling and numbness in her feet, which caused her to trip a lot when she walked. (Tr. 458-59). It also caused shooting pain down the back of her legs, which made standing for long periods of time difficult (half an hour at most) and she did not believe she was capable of standing for six hours in an eight-hour workday. (Tr. 458). She received epidural injections, but they did not alleviate her symptoms. (Tr. 459).

Hutter also had neck pain, which she described as burning and tingling across her neck and shoulders and down into her arms and hands. (Tr. 459-61). This caused her hands to go numb and she would drop things. (Tr. 461). She had a hard time buttoning clothing, zipping zippers, and keyboarding. *Id.* She had no feeling from just under her collarbone to over her shoulders. (Tr. 462-63). She had issues pushing and pulling as well as reaching forward and overhead. (Tr. 463-64). If she went to pick up a box, she would get shooting pains down the back of her neck and across her back. (Tr. 464). If she reached behind her she had pain in her low back. *Id.*

During the relevant period, Hutter also began to experience shortness of breath and chest pains on a regular basis. *Id.* She was placed on anxiety and depression medication because she had gotten depressed and anxious as a result of all her surgeries, and the anxiety would trigger the shortness of breath. (Tr. 465). She also had difficulties sustaining concentration. (Tr. 466-67). She did not believe she could perform semiskilled work on a sustained basis because of her depression and she had memory problems. (Tr. 467).

11

### III. Law & Analysis

#### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B. Step Four: Consideration of the Opinion Evidence

Hutter argues that the ALJ failed to recognize or include in his evaluation of her RFC Dr. Donca's questionnaire or her supporting progress notes. ECF Doc. 12 at 11.

The Commissioner construes this argument as only challenging the ALJ's consideration of the evidence underlying Dr. Donca's questionnaire and responds that Hutter has not demonstrated prejudice, because Dr. Donca's treatment notes repeatedly showed normal gait, range of motion, sensation, and strength. ECF Doc. 14 at 8.

#### 1. Medical Opinion Standard

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). An ALJ must give a treating source opinion controlling weight, unless the opinion is: (1) not "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) inconsistent with findings in the treating source's own records or other medical evidence in the case record. 20 C.F.R. § 404.1527(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017). And, if the ALJ finds either prong justifies giving the treating source opinion less-than-controlling weight, he must articulate "good reasons" for doing so – *i.e.*, explain which prong justifies that decision. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Biestek*, 880 F.3d at 786.

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6). The ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion

and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011)

### 2. Analysis

Hutter is correct. Nowhere in the ALJ's decision did he mention Dr. Donca's questionnaire. *See* (Tr. 427-35). But the ALJ was not required to do so. Hutter had to establish that she was disabled on or before the date last insured, which, in her case, was from January 26, 2013 through December 31, 2014. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Dr. Donca completed the questionnaire on February 18, 2016. (Tr. 1586). Consequently, the ALJ was required to consider Dr. Donca's questionnaire "only to the extent that the limitations provided therein relate back to the period predating the last-insured date." *Civitarese v. Comm'r of Soc. Sec.*, No. 1:19-cv-2015, 2020 U.S. Dist. LEXIS 135160, at *58 (N.D. Ohio July 30, 2020) (citing *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849-50 (6th Cir. 2020)). But Dr. Donca's questionnaire does not appear to relate to the relevant period. She did not specify whether her opinion reflected Hutter's limitations during the relevant period. *See* (Tr. 1530-32). The limitations she ascribed to Hutter's depression do not appear anywhere in Dr. Donca's treatment notes before March 21, 2016. (Tr. 1535-71). And her lumbar spondylosis diagnosis appeared for the first time on February 11, 2016. (Tr. 1531, 1537). Because nothing in Dr. Donca's questionnaire responses indicated that her opinions related back to the period under adjudication, the ALJ was not required to consider it or give it any deference. *Civitarese*, 2020 U.S. Dist. LEXIS 135160, at *59. Accordingly, no remand is warranted on the basis of this issue.

### C. Step Four: RFC

Hutter next argues that the ALJ failed to consider all of the record evidence in his evaluation of her RFC. ECF Doc. 12 at 9-13. Specifically, Hutter contends that the ALJ failed

14

to consider: (1) her upper extremity impairments (burning pain and numbness in her arms and hands radiating from her neck); (2) diagnostic imaging tests performed on April 5, 2015 and August 4, 2015; (3) Dr. Donca's treatment notes; and (4) her depression and anxiety.  ECF Doc. 12 at 9-12.  She also argues that the ALJ only discussed portions of treatment notes supporting his RFC determination while ignoring portions of the same treatment notes that did not.  ECF Doc. 12 at 10.  Hutter claims the ALJ disregarded:

> (1) a portion of her February 22, 2013 visit to Dr. Fernando characterizing Hutter's complaints as neck pain with chronic numbness in her fingers and hyperparasthesia over the neck area, and documenting on physical examination diffuse tenderness in the neck and reduced range of motion;
>
> (2) Dr. Purisima's March 26, 2013 treatment notes describing Hutter's complaints of low back pain causing her right leg to give out, painful lumbar range of motion, and tenderness in the lumbar area;
>
> (3) Hutter's testimony that she experienced low back pain that impacted her lower extremities and caused her to fall, and her October 7, 2014 emergency room visit following a fall; and
>
> (4) a portion of Dr. Ko's October 30, 2014 treatment notes summarizing Hutter's past medical history of neck/back surgeries, Hutter's physical examination findings of pain on flexion and extension, reduced sensation, and reduced reflexes, and Dr. Ko's subsequent treatment notes with similar physical examination findings;

ECF Doc. 12 at 9-11.

The Commissioner responds that the ALJ's determination that Hutter was limited to occasional overhead reach shows that the ALJ did consider her upper extremity limitations.  ECF Doc. 14 at 7.  The Commissioner argues that the diagnostic imaging tests Hutter faults the ALJ for not considering were generated outside the relevant period.  Id.  The Commissioner argues that the ALJ did consider treatment notes showing diminished reflexes and sensation, as well as her subjective symptom complaints, and the ALJ was not required to discuss every single treatment note in detail.  ECF Doc. 14 at 7-8.  The Commissioner argues that Hutter cannot

15

establish prejudice based on the ALJ's failure to discuss Dr. Donca's treatment notes because she consistently found normal gait, range of motion, sensation, and strength. ECF Doc. 14 at 8. And the Commissioner argues that the ALJ properly found her mental impairments to be non-severe. ECF Doc. 14 at 8-9.

### 1. RFC Standard

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

### 2. Analysis

The ALJ applied proper legal standards by considering all of the evidence in making his findings of Hutter's RFC. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Addressing each piece of evidence Hutter claims the ALJ failed to consider, the ALJ *did* consider evidence of her upper extremity impairments. The ALJ discussed her testimony and subjective symptom complaints that her arms would go numb and that she found dressing and bathing difficult. (Tr. 432). The ALJ also discussed an October 29, 2013 EMG of her upper extremities, which "revealed chronic mild left C5 radiculopathy." (Tr. 433 (citing (Tr. 805))). And the ALJ expressly cited Dr. Ko's October 30, 2014 treatment note, which, although the ALJ did not expressly say so, documented

16

her subjective complaint that she had numb, burning pain that radiated into her hands. (Tr. 433, 982).

The imaging tests Hutter argues the ALJ failed to consider were conducted on April 5, 2015, and August 4, 2015 – after the period under adjudication. (Tr. 1111-13, 1116). Evidence post-dating the date last insured is only relevant if it relates back to the claimant's condition on or before the date last insured. *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). Aside from highlighting their absence from the ALJ's discussion of the evidence, Hutter does not explain how or why these imaging test results are relevant to whether she was disabled before December 31, 2014. ECF Doc. 12 at 8-9. Thus, she has failed to establish a basis for remand based on the ALJ's lack of consideration of this evidence. *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited."). Moreover, the August 4, 2015, X-ray of the right hip was not relevant to her condition during the relevant period because it showed mild osteoarthritis, of which there was no mention in her treatment records during the relevant period. (Tr. 1113). And her April 5, 2015 and August 4, 2015, MRI results were similar to relevant-period MRI results the ALJ expressly discussed in his decision. *Compare* (Tr. 433-34) *with* (Tr. 1111-12, 1116); *Rabbers*, 582 F.3d at 654.

As for the treatment notes that were included with Dr. Donca's questionnaire, Hutter mentions only Nurse Practitioner Reho's April 8, 2014 treatment notes and Dr. Donca's June 5, 2014 treatment notes. ECF Doc. 12 at 11 (citing Tr. 1561, 1563, 1566). But aside from two sentences highlighting these treatment notes, Hutter has not explained how these treatment notes contradict the ALJ's RFC. *Williamson*, 731 F.3d at 621. Further, Hutter states that those treatment notes mention Hutter's reported paresthesias of the hands and feet and sleep

17

disturbance, document her anxiety medication, and contain findings of reduced range of motion and tenderness of the lumbar spine. ECF Doc. 12 at 11. But the ALJ discussed treatment records from other treating sources that described Hutter's complaints regarding her hands and back pain, her anxiety medication, and physical examination results noting pain on extension and flexion. *See* (Tr. 433-34 (citing (Tr. 964-65, 982-83, 1042, 1044, 1088))). "There is no requirement, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record." *Day v. Comm'r of Soc. Sec.*, No. 1:16-cv-2813, 2017 U.S. Dist. LEXIS 208434, at *37 (N.D. Ohio Dec. 5, 2017). Thus, any alleged failure to discuss these particular records cannot have been prejudicial to Hutter.

Next is the evidence of her anxiety and depression. The ALJ found these to be non-medically determinable impairments for lack of substantiating objective evidence. (Tr. 430-31). Because they were found to be non-medically determinable (a finding Hutter has not challenged), the ALJ was not required to consider them in his RFC analysis. *Davis v. Comm'r of Soc. Sec.*, No. 3:19-cv-00386, 2021 U.S. Dist. LEXIS 5949, at *12-13 (S.D. Ohio Jan. 12, 2021).

Hutter's last challenge is likewise unavailing. The ALJ considered Hutter's subjective symptom complaints regarding her upper and lower extremities and discussed treatment records documenting her back pain and its radiation to her extremities, her medical history, and the physical examination findings she faults the ALJ for not explicitly summarizing. (Tr. 432-33). The ALJ wasn't required to summarize every treatment note in detail. *Bosely v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010). The ALJ was required to consider the medical record as a whole, and he did just that, stating that he gave "careful consideration of the entire record." (Tr. 430). "The obligation to *consider* the entire record is not an obligation to

18

summarize the entire record. *Austin v. Comm'r of Soc. Sec.*, No. 1:19-cv-2380, 2020 U.S. Dist. LEXIS 253171, at *33 (N.D. Ohio July 7, 2020).

Further, substantial evidence supports the ALJ's RFC finding that Hutter could perform light work, except she could only stand and walk for four hours in an eight-hour workday, occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch, and reach overhead. Specifically: (1) Dr. Klyop's and Dr. Lewis's opinions to that effect; (2) Dr. Purisima's March 26, 2013 treatment notes, noting that Hutter could walk without difficulty despite weakness and pain; (3) Dr. Strickland's September 26, 2013 treatment notes, noting "fair" and "good" range of motion; (4) Dr. Ko's January 6, 2015 treatment notes noting up to 60% relief from pain with transforaminal injection during and after the relevant period; (5) Dr. Ko's March 4, 2015 treatment notes, noting that Hutter had been doing heavy lifting; and (6) Physical examination results through the date last insured showing reduced range of motion of the lumbar spine but otherwise normal range of motion, 4/5 strength, normal sensation, and normal gait. (Tr. 482-84, 528-29, 809, 818, 860, 866, 909, 982-83, 1082-83, 1085-86, 1088-89, 1561-62, 1565, 1567-68). Because the ALJ's RFC finding was reasonably drawn from the evidence, it fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *O'Brien*, 819 F. App'x at 416; *Mullen*, 800 F.2d at 545.

Upon careful consideration of the record before the court, Hutter has not demonstrated that the ALJ failed to apply proper legal standards or reach a conclusion supported by substantial evidence in determining Hutter's RFC.

## IV. Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hutter's application for DIB is affirmed.

**IT IS SO ORDERED.**

Dated: September 3, 2021

Thomas M. Parker
United States Magistrate Judge